**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
**HAMMERSTONE NV, INC., JAMES LISSETTE,** :
**HANNAH W. LISETTE, MATRIX CAPITAL** :
**GROUP, STEPHEN J. SHAPIRO, ASSENT, LLC,** :
**DENK, INC., and LWP1, INC.,** :
:
                **Plaintiffs,** :
: **09 CV 2685 (HB)**
         - against - :
: **OPINION &**
**MICHAEL J. HOFFMAN and WALTER S. SOBON,** : **ORDER**
:
                **Defendants.** :
:
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

      Plaintiffs Hammerstone NV, Inc., LWP1, Inc., James Lissette on behalf of his IRA and his children Weston Lissette and Emerson Lissette, Hannah W. Lissette on behalf of her IRA, Matrix Capital Group, Stephen J. Shapiro, Assent, LLC, and Denk, Inc. (collectively "Plaintiffs") were shareholders in Constar International Inc. ("Constar"), a PET packaging manufacturer. They bring this action against senior executives at Constar, defendants Michael J. Hoffman ("Hoffman") and Walter S. Sobon ("Sobon") (collectively "Defendants"), for alleged violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and for common law fraud. Plaintiffs claim that Defendants defrauded shareholders by misleading them about Constar's financial health, and with regard to an agreement on a plan to restructure Constar's capital structure by converting debt to equity through a pre-planned bankruptcy. Defendants moved to dismiss the Amended Complaint for failure to state a claim. Fed.R.Civ.P. 12(b)(6). For the reasons that follow, Defendants' motion is GRANTED and Plaintiffs' amended complaint is DISMISSED.

# FACTUAL BACKGROUND[1]

*Parties and Events Relevant to the Action*

Plaintiffs are all former shareholders of Constar who purchased stock between October 28, 2008, and December 29, 2008.  Am. Compl. ("AC") ¶¶ 5-12.  Constar is a Delaware corporation with its principal place of business in Philadelphia.  AC ¶ 13.  The corporation manufactures and sells polyethylene terephthalate ("PET") packaging products, i.e. the plastic bottles for soft drinks, condiments, and other groceries.  AC ¶ 17.  Constar was a publicly-traded company during the relevant time period.  *See* AC ¶ 18; Constar International Inc., Annual Report (Form 10-K), at 3 (Mar. 31, 2008).  Hoffman was Chief Executive Officer and President of Constar[2] and Sobon was Chief Financial Officer and Executive Vice President throughout the period in question.  AC ¶¶ 14-16.

In 2008, Constar disclosed that it had serious financial difficulties with its business operations and capital structure.  *See* AC ¶ 18.  A May 15, 2008 quarterly report indicated that Constar was "highly leveraged," with around $400 million in outstanding long-term debt and only around $33 million in outstanding common stock as of March 31, 2008.  *See* Quarterly Report (Form 10-Q), at 3 (May 15, 2008) ("May 15 10-Q") (indicating 12,717 million outstanding shares); Decl. of Robert J. Jossen in Supp. of Defs.' Mot. to Dismiss ("Jossen Decl."), Ex. C (historical prices of Constar stock, January-December 2008, indicating $2.62 per share closing price on March 31).  Constar also suffered net losses over the previous three years, with a net loss of $7.5 million for that quarter.  May 15 10-Q at 8, 10.  Pepsi, the soft drink manufacturer, accounted for approximately 35% of Constar's 2007 revenue, and their contract was set to expire by the end of the year.  *Id.*  Constar issued similar warnings about the financial well-being of the company in August 2008: the company was still significantly leveraged, indicated that its unit volume had declined by over 20% due to movement towards self-

---

[1] The following facts are taken from the Amended Complaint, the factual allegations of which are accepted as true for these purposes, as well as from public filings referenced and relied upon in the Amended Complaint and public information of which the court may take judicial notice.

[2] The Amended Complaint refers to Hoffman, in addition to his role as President, as both the Chief Executive Officer and the Chairman of Constar.  AC ¶ 1, 14.  The single reference to Hoffman as "Chairman" of Constar appears to be a mistake, as he is otherwise only referred to as CEO and President in public filings and in the briefing papers of both parties.  *See, e.g.,* Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss the Am. Compl., at 1; Constar International Inc., Annual Report (Form 10-K), at 44 (Mar. 31, 2008).  Regardless, it does not affect the outcome of this decision.

manufacturing by water bottlers and other externalities, and predicted that this shift and the related "pricing pressure" would continue for the foreseeable future. Quarterly Report (Form 10-Q), at 30-31 (August 14, 2008). Constar was in the process of re-negotiating the Pepsi contract, but believed it would be at "significantly lower volumes" and "will result in lower sales." *Id.* On October 16, 2008, Constar issued a press release that confirmed a renewed contract with Pepsi. AC ¶ 19. The release stated, among other things, that the contract would be for less volume than the previous one, and that Constar's Board of Directors had approved a cost-saving restructuring plan in conjunction with the new contract that would close or reduce operations at certain facilities. Current Report (Form 8-K) (Oct. 16, 2008). It also stated, "Based upon the Company's current estimates, the Company believes that the impact of the New Agreement, when combined with the annual cash overhead savings from the restructuring plan, will result in higher cash flows from operating activities, net of investing activities as compared to those realized from the Pepsi cold fill business in 2008." *Id.*

Due to the imbalance between the company's debt and equity, as well as the other financial concerns, at some point in the latter half of 2008 Constar entered negotiations with its bondholders to consider a potential debt for equity conversion. *See* AC ¶¶ 20-21. On November 14, 2008, the company issued a quarterly report that stated:

> The Company is currently engaged in preliminary discussions with holders of a majority of the Company's Subordinated Notes regarding a potential debt-for-equity exchange…If completed, such exchange will cause substantial dilution to, or the cancellation of, currently outstanding Common Stock…One potential outcome of these discussions could be a pre-arranged Chapter 11 filing in which subordinated notes would be converted to equity and all other creditors would be unimpaired…There can be no assurance that the Company's discussions with the holders of Subordinated Notes will result in this or any transaction.

AC ¶ 26; Quarterly Report (Form 10-Q) (Nov. 14, 2008). On the same day, Defendants participated in a conference call, and both made reference to the potential debt for equity exchange. AC ¶ 25. Hoffman stated that "[s]everal holders of our $175 million unsecured notes have expressed the desire to meet with management with an interest in a debt for equity swap" and noted that Constar hired a financial advisor to help evaluate the proposal, while Sobon stated "we are currently in discussion with more than a majority of the holders of our $175 million unsecured debt regarding a potential debt for equity swap." *See* AC ¶ 25; Jossen Decl., Ex. H (Constar Third Quarter Earnings Conference Call Transcript, Nov. 14, 2008). On December 12,

2008, Constar filed a "Bondholders Presentation" with the SEC that included bullet points on "the proposed debt to equity exchange" and a management recommendation for "the proposal for an unimpaired, pre-arranged debt for equity swap." *See* AC ¶ 31; Current Report (Form 8-K), Ex. 99.1 (Constar Bondholder's [sic] Presentation, Dec. 9, 2008). Finally, on December 30, 2008, Constar issued a press release that announced it had reached an agreement with the holders of a "majority in principal amount of the Company's Subordinated Notes regarding a debt-for-equity exchange." Jossen Decl., Ex. J (Constar Press Release, Dec. 30, 2008); *see also* AC ¶ 32. The exchange would be done through a pre-arranged Chapter 11 bankruptcy filing and, most critical to this action, the existing equity would be canceled out entirely in favor of the new equity provided to the converting bondholders. *Id.*

*Allegations of Material Omissions and Misstatements*

Precisely how and when Constar came to the debt-for-equity agreement and the decision to cancel existing equity is the primary source of this dispute. Plaintiffs' basic argument is that, by October 2008, Defendants already agreed to one particular debt for equity restructuring plan that would cancel out the equity of existing shareholders rather than dilute their value. As a result, they "had a duty to disclose their plans as a material event on or prior to October 28, 2008 in order to avoid making a prior public statement misleading." AC ¶ 1. The allegedly misleading "prior public statement" is the October 16, 2008 Constar press release regarding the new contract with Pepsi. "Plainly, any optimism garnered by the agreement with Pepsi and the restructuring of manufacturing facilities," Plaintiffs argue, "is misleading if equity holders were to be cancelled as of 2009." AC ¶ 24. Plaintiffs also allege that, since Defendants knew of the plan to cancel out the existing equity, the failure to disclose this plan until December 30, 2008 also made the November 14 and December 9 statements misleading. AC ¶¶ 27, 31. In other words, the statements about a "potential" plan and the different possible effects on existing equity were misleading because Defendants already had a deal in place, and therefore knew before November that there was no option of either a cancelation or dilution of equity, or any ongoing discussions about how to treat existing equity. As such, "[Defendants]'s statements intentionally or recklessly lulled plaintiffs into a false sense of security that the equity swap would benefit the entire company, including the current equity holders." AC ¶ 27.

Plaintiffs point to a February 3, 2009 bankruptcy disclosure statement submitted by Constar as evidence of Defendants' knowledge of a single plan by late October. The statement, listed under the header "Events Leading to the Chapter 11 Case" and sub-header "Debtors Begin Development of Proposed Plan" describes the events leading up to the debt for equity exchange as follows:

> Constar and its representatives began discussions with certain holders of its Senior Subordinated Notes during October 2008 with respect to possible restructuring alternatives. These discussions led to the formation of an ad hoc committee of holders of the Senior Subordinated Notes (the "Ad Hoc Committee"). Upon information and belief, the members of the Ad Hoc Committee hold, in the aggregate, over 50% of the principal face amount of the Senior Subordinated Notes…The first meeting between Constar (or its representatives) and the Ad Hoc Committee (or its representatives) occurred on October 27, 2008. At that meeting and in subsequent discussions, the parties discussed the conversion of the Senior Subordinated Notes into new equity of Constar. Such a transaction would be highly beneficial to the Debtors as it would significantly de-lever Constar's balance sheet and materially reduces its annual debt service obligations…On or about December 15, 2008, Constar and a majority of the holders of the Senior Subordinated Notes reached an agreement in principle on the terms of a framework for a restructuring whereby Constar and certain of its subsidiaries would file chapter 11 petitions and, simultaneously, a pre-arranged plan of reorganization (a) providing for the conversion of the Senior Subordinated Notes into all of the equity of the reorganized entities, excluding those shares reserved for Constar's management, while (b) leaving the Debtors' trade vendors and the holders of the Senior Secured FRNs unimpaired. While the constituents of the Ad Hoc Committee are not legally bound to support the restructuring plan, the conversion of the Senior Subordinated Notes into equity, the payment of trade vendors in full and the reinstatement of the Senior Secured FRNs has the support of the holders of more than 50 percent of the outstanding Senior Subordinated Notes."

AC ¶ 22; Jossen Decl., Ex. M, at 6-7 (Second Am. Disclosure Statement for the Debtors' Second Am. Joint Plan of Reorganization) (the "Disclosure Statement"). According to Plaintiffs, the statement "refers just to one plan, which is the cancellation of the current equity and the issuance of new equity to the bondholders and management" and that if alternative plans were being considered they also would have been specifically mentioned. AC ¶ 22, 23. As additional evidence that Defendants knew and agreed upon a plan to cancel existing equity, Plaintiffs also allege that Defendants knowingly withheld this information "for the purpose of protecting their bonuses and expected share of equity in the reorganized Constar." AC ¶ 35. They further note

5

that Sobon sold 100,000 shares of common stock on December 12, 2008 at 14 cents a share, allegedly because he already knew that they would be worthless once the plan to cancel the shares was revealed.  AC ¶ 37.  Plaintiffs' state that they were induced to purchase Constar stock at artificially inflated prices during the period in which Defendants misleadingly disclosed that the share value could either be diluted or canceled, and suffered damages once the market learned that the existing equity would definitely be canceled and the shares therefore rendered worthless.  *See* AC ¶¶ 27, 29-33, 44.

## DISCUSSION

### *Legal Standards*

A complaint will be dismissed under Rule 12(b)(6) if there is a "failure to state a claim upon which relief can be granted."  Fed.R.Civ.P.12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must "plead enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (plaintiff must raise right to relief "above a speculative level").  A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Where the court finds well-pleaded factual allegations, it should assume their veracity and determine whether they "plausibly give rise to an entitlement to relief."  *Id.* at 1950; *see also South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 104 (2d Cir. 2009).  In addition to well-pleaded factual allegations, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI*, 493 F.3d at 98; *see also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000) (court may take judicial notice of "well-publicized" stock prices).

### *Pleading Requirements*

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance

6

in contravention of such rules and regulations as the Commission may prescribe … ." 15 U.S.C. § 78j(b). To state a cause of action under section 10(b) and Rule 10b-5, plaintiffs must allege that defendants: (1) in connection with the purchase or sale of securities; (2) made materially false statements or omissions; (3) with scienter; (4) upon which plaintiff relied; and (5) was injured as a result. *See ECA v. J.P. Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). A complaint that alleges securities fraud must also satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), as well as Rule 9(b) of the Federal Rules of Civil Procedure. *ECA*, 553 F.3d at 197. Under the PSLRA, a complaint that alleges securities fraud "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, plaintiffs must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2). Any fraud allegation, including securities fraud, must also meet the similar pleading requirements of Rule 9(b), which requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). This means that the complaint must identify the allegedly fraudulent statements and explain why they are fraudulent, specify who made the statements, and specify where and when the statements were made. *See In re Scholastic Corp. Secs. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001). Although scienter according to Rule 9(b) "may be alleged generally," this still requires plaintiffs "to allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

### *Securities Fraud Claims*

Defendants claim that Plaintiffs have failed to demonstrate an actionable material misstatement or omission, and failed to sufficiently plead a strong inference of scienter for either Sobon or Hoffman. Defs.' Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Am. Compl. ("Defs.' Mem."), at 10-23.

Material Omission or Misstatement

7

Under the Exchange Act, a misstatement or omission is only actionable if it is a "material" misstatement. *See ECA*, 553 F.3d at 197. A statement is material "if there is a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re IBM Corp. Secs. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998) (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)); *see also ECA*, 553 F.3d at 197. An affirmative misrepresentation is a statement that is false when made; a statement of opinion or belief is an actionable affirmative misstatement if it is known to be false at the time it is made. *See In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 266 (2d Cir. 1993); *Shields*, 25 F.3d at 1131 (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991)). With regard to omissions, "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito v. Imcera Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995). An omission is only actionable if there is a duty to disclose the omitted facts. *Time Warner*, 9 F.3d at 267. A duty to disclose arises when: (1) required by SEC rules; (2) when an insider trades on the basis of nonpublic information; or (3) "when disclosure is necessary to make prior statements not misleading." *See Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009) (quoting *Time Warner*, 9 F.3d at 268); *see also IBM*, 163 F.3d at 110 ("A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event."). Plaintiffs allege omissions on the part of Defendants, in that they failed to disclose until December 30, 2008, that they had reached a debt for equity swap agreement with their bondholders by October 28, 2008, which would cancel out the existing equity. AC ¶¶ 24, 27, 31. Plaintiffs allege that Defendants had a duty to disclose because the agreement to cancel the existing equity made three particular public statements misleading – the October 16 press release, the November 14 quarterly report and conference call, and the December 9 presentation. *Id.*

**October 16, 2008 Constar Press Release**

There is no actionable misrepresentation with regard to the October 16 Constar press release, which touted the new contract with Pepsi. Plaintiffs concede that the earliest possible time an agreement on the debt for equity exchange could have been reached is by October 28, 2008, after the meeting between the Constar representatives and the Ad Hoc Committee representatives, and that only "informal meetings to discuss the restructuring of Constar's

8

indebtedness" occurred before that date. AC ¶ 20. They allege that Defendants "had a duty to disclose the cancellation of equity as of October 28, 2008" because the agreement rendered the "optimistic statements" of October 16 misleading. First, this is insufficient to raise a duty to disclose; Plaintiffs' cannot rest on a barebones assertion that the agreement rendered generally "optimistic" statement about the health of the company misleading. "[T]here is no duty to update vague statements of optimism or expressions of opinion." *IBM*, 163 F.3d at 110. The press release says absolutely nothing about a debt for equity exchange, and focuses entirely on the Pepsi agreement and a decision to close or reduce operations at certain manufacturing facilities in order to reduce costs. *See* Current Report (Form 8-K), Oct. 16, 2008. Plaintiffs' do not point to any particular statement in the press release that is even tangentially related to a debt for equity swap such that it constituted a duty to update the information provided in the press release once the specifics of the swap were agreed upon. The lack of factual allegations to support a duty to disclose stands in stark contrast to *Time Warner*, where the Second Circuit found a duty to disclose alternative capital-raising plans because the company was "hyping" a single plan, "thereby inducing investors to believe that alternatives were excluded." *Time Warner*, 9 F.3d at 268. The Second Circuit has stated that *Time Warner* "went nearly to the outer limit of the line that separates disclosable plans from plans that need not be disclosed," *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 810 (2d Cir. 1996), and Plaintiffs' allegations do not meet its standards. Plaintiffs cannot contort this statement about closing facilities and a new contract into an oblique promise not to cancel the existing equity. "[S]uch puffery cannot have misled a reasonable investor to believe that the company had irrevocably committed itself to one particular strategy, and cannot constitute actionable statements under the securities laws." *San Leandro*, 75 F.3d 801, 811 (2d Cir. 1996).

Second, even if there were a duty to update by October 28, 2009, Plaintiffs have not sufficiently alleged, pursuant to Rule 9(b) and the PSLRA, "in what respects the statements at issue were false." *San Leandro*, 75 F.3d at 812. The sum and substance of Plaintiffs' factual allegations that a deal was in place by October 28 are the statements in the above-described February 3, 2009 bankruptcy disclosure by Constar. AC ¶¶ 22-23; Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss the Am. Compl. ("Pls.' Mem."), at 2, 9-11 ("The Disclosure Statement, thus, supports the allegations in the Amended Complaint that as of October 28, 2008, the cancellation of the current equity was the only transaction considered … ."). However, the

9

Disclosure Statement is insufficient on its own to support an allegation that Defendants had agreed to a single plan to cancel the existing equity by late October.  The  Disclosure Statement is quite obviously a compressed summary of events leading up to bankruptcy.  It states that Constar "began discussions" with debt holders "during October 2008 with respect to possible restructuring alternatives."  Disclosure Statement at 6-7.  This led to the creation of the "Ad Hoc Committee" of note holders, of which "the first meeting…occurred on October 27, 2008."  *Id.*  The parties discussed conversion of the debt into equity "at that meeting and in subsequent discussions."  *Id.*  According to the Disclosure Statement, an agreement "providing for the conversion of the Senior Subordinated Notes into all of the equity of the reorganized entities" was not reached until December 15, 2008.  *Id.*  In other words, the statement itself belies the claim that "no other plan was under consideration at the time."  AC ¶ 23.  Rather, Plaintiffs have pointed to a document which suggests that the decision to cancel or dilute existing equity, was not finalized until December 15, 2008 at the earliest.  Finally, Plaintiffs offer no statements by witnesses, no e-mails, no corporate reports, no news articles, that could support their claim that a single deal to cancel existing equity was in place or that it was the only one under consideration.  *See Fant v. Perelman*, No. 97 Civ. 8435 (LAP), 1999 WL 199078, at *7 (S.D.N.Y. Apr. 9, 1999) ("Plaintiffs, however, allege no *facts* to support their conclusion…and, accordingly, this allegation is insufficient as a matter of law.") (emphasis in original); *contra Montoya v. Mamm.com Inc.*, No. 05 Civ. 2313 (HB), 2006 WL 770573, at *4 (S.D.N.Y. Mar. 28, 2006) ("the press reports and confidential sources cited in the complaint are sufficiently specific to support plaintiffs' claim…").

### November 14, 2008 Constar Quarterly Report and Conference Call

Plaintiffs next allege that Defendants made misleading statements in the November 14, 2008 Quarterly Report, where Constar first publicly mentioned a potential conversion of debt to equity and stated that, "[i]f completed, such exchange will cause substantial dilution to, or the cancellation of, currently outstanding Common Stock."  Quarterly Report (Form 10-Q) (Nov. 14, 2008).  That particular statement is misleading because, according to Plaintiffs, it indicated cancellation as one option, "rather than stating that the Company and committee of noteholders had agreed upon the cancellation of the outstanding common stock and dilution was not under consideration."  AC ¶ 26.  They also allege that Defendants made misleading statements about

the debt for equity exchange in a conference call on that same day when they failed to mention that they would cancel the existing equity as part of the restructuring plan. AC ¶ 25.

A duty to update the statements in the Quarterly Report and the conference call would be significant if Constar and Defendants had committed to a single plan of action with regards to the debt for equity swap, but here the record suggests that Defendants discussed at least two potential alternatives. *See Time Warner*, 9 F.3d at 267. Plaintiffs face the same particularity issue here with regards to both the report and phone call: they fail to sufficiently allege any facts that would support a conclusion that Constar had actually agreed upon a single plan to cancel the existing equity by November 14, 2008. As noted, *supra*, the February 3, 2009 Disclosure Statement does not on its own indicate or raise a fair inference that Constar had decided it would cancel the existing equity in October or even November. To the contrary, it alleges a deal was not reached until mid-December. "The naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud." *Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 348 (S.D.N.Y. 2005) (internal quotation omitted). The November 14 conference call statements also contradict Plaintiffs' account of events: both Sobon and Hoffman refer to the potential deal as unsettled and still under negotiation. *See* Jossen Decl., Ex. H (Constar Third Quarter Earnings Conference Call Transcript, Nov. 14, 2008) ("[s]everal holders of our $175 million unsecured notes *have expressed the desire to meet with management* with an interest in a debt for equity swap" and "*we are currently in discussion* with more than a majority of the holders of our $175 million unsecured debt regarding a potential debt for equity swap.") (emphasis added). In short, there is no support for Plaintiffs' view that there was a plan to cancel the existing equity, at least not at the relevant time.

The cases cited by Plaintiffs in support of their cause of action actually provide good examples as to why their claim must fail. In *Siemers v. Wells Fargo & Co.*, a District Court for the Northern District of California determined statements to be misleading where a mutual fund stated that it "may" consider sales of fund shares in its selection of an investment adviser when "in truth, the investment adviser had *already* entered into firm kickback arrangements." No. C 05-04518, 2006 WL 2355411, at *5 (N.D.Cal. Aug. 14, 2006) (emphasis in original). In that case, however, there was no dispute that the agreements were actually in place at the time the funds were claiming they "may" be considered. *Id.* at *5-6. Similarly, in *In re Novastar*

*Financial Securities Litigation*, a statement that a failure to comply with government regulations "*could* adversely affect our operations and profitability" was misleading because the company had already been fined for failing to comply with state mortgage regulations.  No. 04-0330-CV-W-ODS, 2005 WL 1279033, at *3-4 (W.D.Mo. May 12, 2005) (emphasis added).  Indeed, in *Novastar*, the complaint specifically alleged the fact that the defendants had actually been sued, and cited a letter from the state agency, SEC filings, and other factual statements to support their claims.  *Id.*  By contrast, whether an agreement to cancel the existing equity was in place by November is a central disputed point in this litigation, and Plaintiffs provide no facts that would suggest that there was actually only a single plan under consideration.  Plaintiffs may assert that Defendants' statements are misleading because they "disclosed a contingency" rather than an "actuality," Pls.' Mot. at 11, but they have failed to provide sufficient factual allegations to support this argument.

### December 9, 2008 Constar Presentation

Finally, Plaintiffs allege that a December 9, 2008 publicly filed "Investor Presentation" by Constar was also misleading because "neither the Investor Presentation nor the 8-K to which it was attached disclosed that the debt for equity exchange was conditioned on the cancellation of the current equity, rendering it virtually worthless."  AC ¶ 31.  Plaintiffs engage in a bit of sleight of hand: the "Investor Presentation" that Plaintiffs refer to in their Amended Complaint but do not attach is actually titled "Bondholder's [sic] Presentation: Business and Proposal."  Current Report (Form 8-K), Ex. 99.1, at 1. (Constar Bondholder's [sic] Presentation, Dec. 9, 2008).  The difference is subtle but important: this does not appear to be a presentation to all investors including equity holders, who could be misled into purchasing equity that would soon be canceled and rendered worthless, but rather a presentation to the bondholders, the very people who needed to vote on the type of restructuring agreement, if any, they would accept.  In fact, it includes the bullet point, "Management strongly recommends the proposal for an unimpaired, pre-arranged debt for equity swap…." Ex. 99.1 at 38.  In other words, the presentation itself actually further supports Defendants' contention – as portrayed in the February 3, 2009 Disclosure Statement – that Constar had not agreed on a plan to cancel the existing equity until December 15, 2009.  Plaintiffs' insistence that "[o]n December 9, 2008, Constar announced it reached an agreement with its senior subordinated noteholders to convert the debt into equity" but failed to disclose the cancellation of equity, Pls.' Mot. at 4, is unsupported by factual

allegations and contradicted by the very documents they cite for support. "Such allegations fall pitifully short of the pleading requirements here applicable," and are insufficient to support an actionable claim of misrepresentation. *See Pollio v. MF Global, Ltd.*, 608 F.Supp.2d 564, 570 (S.D.N.Y. 2009).

Scienter

Even if Plaintiffs had alleged a material misstatement with sufficient particularity, their securities fraud claim also fail to sufficiently allege a strong inference of scienter. A requirement for section 10(b) and Rule 10b-5 securities fraud liability, Plaintiffs must establish that Defendants had "an intent to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2005) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976)). Since the PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2), Plaintiffs must allege an inference of scienter that is "more than merely 'reasonable' or 'permissible' – it must be cogent and compelling…at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *see also ECA*, 553 F.3d at 198; *ATSI*, 493 F.3d at 99. An "inherently comparative" endeavor, a court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 325; *ECA*, 553 F.3d at 198. Plaintiffs may demonstrate a strong inference of scienter in two distinct ways: (1) "alleging facts to show that defendants had both motive and opportunity to commit fraud" or (2) "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[3] *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); *see also Scholastic*, 252 F.3d at 74. Plaintiffs' allegations fail on both scores.

**Motive & Opportunity**

As the most senior executives at Constar, as well as negotiators of the debt for equity conversion plan, Plaintiffs have sufficiently alleged that both Sobon and Hoffman had the opportunity to withhold their alleged decision to cancel the existing equity until the end of

---

[3] Plaintiffs assert that there is a "third basis" for a strong inference of scienter: "knowing facts that made their public statements misleading." Pls.' Mot. at 7. Plaintiffs are incorrect. "[W]hat plaintiff contends is a third method, showing that defendants had actual knowledge of facts contradicting their public statements, is part of the second method of demonstrating scienter, by setting forth allegations that demonstrate strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 141 n.5.

13

December.  *See San Leandro*, 75 F.3d at 813 (defendants had opportunity to manipulate price of stock because they "held the highest positions of power and authority within the company"); *see also Time Warner*, 9 F.3d at 269.  Their allegations fail, however, when it comes to the supposed motives of Defendants.  The desire to protect ones' compensation, like the alleged bonuses and equity offering Plaintiffs point to, is insufficient on its own to show motive.  "To allege a motive sufficient to support the inference that optimistic but erroneous statements were fraudulently made, a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold."  *Shields*, 25 F.3d at 1130; *see also Acito*, 47 F.3d at 54 ("the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference").  These allegations are a good example of why compensation without more is an insufficient allegation of motive: nowhere do Plaintiffs explain why a decision by Defendants to wait months to disclose that they had decided to cancel the existing equity would somehow be more beneficial to their compensation than if they had disclosed it immediately.  They do not allege that Defendants' bonuses were tied to stock value, nor do they explain how keeping the plan a secret would affect the new equity they would receive.  *See ECA*, 553 F.3d at 201 (allegations insufficient where plaintiffs failed to link supposed motive, acquisition of corporation in exchange for fewer shares, with alleged misconduct, failure to properly disclose unrelated transaction in financial statements).

The alleged sale of Constar stock by Sobon also fails to demonstrate a motive that would lead to an inference of scienter.  The sale of stock by a corporate defendant can, but may not be, sufficient to demonstrate motive.  *See, e.g., Scholastic*, 252 F.3d at 74-75.  Plaintiffs must demonstrate some sort of "unusual" trading activity during the class period.  *See id.*; *Acito*, 47 F.3d at 54.  Factors include "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  *Scholastic*, 252 F.3d at 74-75.  That the sale was disclosed, a small relative amount of shares sold (e.g. less than 11%), the continued ownership of additional shares, and a lack of other insiders sales are all indicative of a lack of motive.  *See, e.g., Acito*, 47 F.3d at 54; *San Leandro*, 75 F.3d at 814.  Plaintiffs' primary problem here is that, based on unrebutted public records, Sobon did not actually sell 100,000 shares of stock.  Rather, according to a "Form 4" filed with the SEC, Sobon sold only 11,666 shares – little more than 10% of his Constar share holdings – and did so for the stated purpose of "satisfy[ing] tax liabilities associated with the vesting of restricted stock."

14

Walter Stanley Sobon, Statement of Changes in Beneficial Ownership of Securities (Form 4) (Jan. 30, 2009). Other than the shares sold for tax purposes, Sobon actually appears to have *maintained* ownership of 100,000 shares, which likely became worthless along with the rest of the existing equity. There are also no allegations of sales by Hoffman or any other corporate insiders. Sobon's sale of less than 10% of his shares for tax purposes is not sufficiently unusual to demonstrate motive. *See In re Bristol-Myers Squibb Secs. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (sales of stock for tax purposes by insider coupled with increase in holdings "insufficient to carry their burden of pleading"); *see also Acito*, 47 F.3d at 54.

### Conscious Misbehavior or Recklessness

Plaintiffs' "main basis" for their scienter allegations is that Defendants, as senior executives and negotiators with the debt holders, knew or recklessly failed to learn that Constar planned to cancel the existing equity since October 28, 2008. Pls' Mot. at 7; AC ¶¶ 34-37. Conscious misconduct can be shown by demonstrating "intentional misconduct," which "encompasses deliberate illegal behavior" or by showing "recklessness," which is conduct that is "highly unreasonable" and "an extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308; *Scholastic*, 252 F.3d at 76; *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 616 (S.D.N.Y. 2008). To allege actual conscious misconduct or recklessness, as opposed to inferring it through motive, is a correspondingly more difficult burden for Plaintiffs to bear. *See Kalnit*, 264 F.3d at 142 ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."). Although this is a fact-specific inquiry, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Pollio*, 608 F.Supp.2d at 572 (quoting *Novak*, 216 F.3d at 308).

Here, no such facts are alleged, other than the allegation that the Defendants were involved in the negotiations with the debt-holders. AC ¶ 34. Plaintiffs may argue that this single fact shows that Defendants "knew all along that the current equity was to be cancelled," but this conclusion is not rooted in any factual allegation. "Plaintiffs' generic, conclusory statement that fraudulent intent existed is simply not enough to meet the heightened pleading standards for

15

securities fraud cases." *Garber*, 537 F. Supp. 2d at 618.  Again the cases cited by Plaintiffs expose the flaws in their pleadings rather than support their arguments.  In *Novak*, the Second Circuit determined that Plaintiffs adequately alleged that Defendants knew of inventory problems and misleading disclosures about inventory because they made specific factual allegations to support their scienter claims, such as public disclosures where they admitted inventory problems, internal company reports, and confidential sources.  *See Novak*, 216 F.3d at 312-13.  Plaintiffs' allegations simply do not contradict the factual explanation of events Plaintiffs themselves pointed to in the February 2009 Disclosure Statement or in the other public disclosures.  The Disclosure Statement, the November 2008 Quarterly Report and Constar conference call, and the December 2008 Bondholder Presentation all clearly suggest that Constar did not agree to a particular method of debt for equity conversion until mid-December 2008.  Yet Plaintiffs insist that Defendants agreed to a single plan by October 2008.  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Novak*, 216 F.3d at 309 (*citing San Leandro*, 75 F.3d at 812).

\*     \*     \*

Ultimately, Plaintiffs' securities fraud claim "fits squarely into the legion of cases wherein investor plaintiffs, disappointed in the outcome of their investment, conclude that somewhere, sometime in the past, a plan was hatched without their knowledge and that subsequent events and statements were all fraudulent attempts to keep the plaintiffs from uncovering the secret plan." *Abbad v. Amman*, 285 F. Supp. 2d 411, 420 (S.D.N.Y. 2003). Plaintiffs failed to sufficiently plead either a material omission or the scienter of the Defendants with sufficient particularity under Rule 9(b) and the PSLRA.  As such, their cause of action pursuant to section 10(b) and Rule 10b-5 of the Exchange Act is dismissed.

*Control Person Liability*

Plaintiffs also bring a cause of action for "control person liability" under section 20(a) of the Exchange Act.  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI*, 493 F.3d at 108.  Since Plaintiffs fail to allege a primary

violation under section 10(b) and Rule 10b-5, their cause of action under section 20(a) of the Exchange Act for control person liability must also fail.  *Id.*

### *Common Law Fraud Claims*

Plaintiffs' common law fraud cause of action against the Defendants also must be dismissed.  Common law fraud has the same essential required elements as a section 10(b) securities fraud claim.  *See, e.g., Wynn*, 273 F.3d at 156 (2d Cir. 2001); *JHW Greentree Capital, L.P. v. Whittier Trust Co.*, No. 05 Civ. 2985(HB), 2006 WL 1080395, at *7 (S.D.N.Y. Apr. 24, 2006).  Although a common law fraud claim need not meet the particularity requirements of the PSLRA, it still must meet the nearly identical requirements of Rule 9(b).  *See Muller-Paisner v. TIAA*, 289 Fed. Appx. 461, 463 (2d Cir. 2008) (noting that both standards "require a plaintiff to specify the statements or omissions that the plaintiff contents were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent").  Plaintiffs' common law fraud claims "essentially track their Section 10(b) claims" and must likewise be dismissed for failure to sufficiently plead a fraudulent omission or a strong inference of scienter with sufficient particularity.  *See In re Vivendi Universal S.A. Secs. Litig.*, No. 02 Civ. 5571(RJH), 2004 WL 876050, at *11; *Dujardin*, 359 F. Supp. 2d at 354 (analysis with regard to dismissal of securities fraud claim "applies with full force" to common law fraud claims).

### *Rule 11 & the PSLRA*

Under the PSLRA, courts are required, "upon final adjudication of the action" to make specific Rule 11 findings. 15 U.S.C. § 78u-4(c)(1); *see also Rombach,* 355 F.3d. at 178.  "[L]iability for Rule 11 violations "requires only a showing of objective unreasonableness on the part of the attorney or client signing the papers." *ATSI Commc'ns, Inc. v. Shaar Fund*, *Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009).  Plaintiffs claims were not harassing or frivolous, and Defendants did not affirmatively allege any improper conduct or move for sanctions.  Therefore, the Court finds no basis to conclude that Plaintiffs or their counsel violated their obligations under Rule 11(b).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for failure to state a claim is GRANTED and the case is DISMISSED. The Clerk of the Court is instructed to close this case and remove it from my docket.

**SO ORDERED**
March 10, 2010
New York, New York

_____
U.S.D.J.